G. BAUKNECHT GmbH, Plaintiff,

v.

ELECTRONIC RELAYS, INC., et al., Defendants.

No. 82 C 3745.

United States District Court,
N.D. Illinois, E.D.

July 15, 1983.

James K. Toohey, Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., for plaintiff.

Thomas I. Matyas, Rosenthal & Schanfield, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

G. Bauknecht GmbH ("Bauknecht") sues Electronic Relays, Inc. and ERI-Energy, Inc. (collectively "ERI"), ERI President Joseph Pascente ("Pascente") and ERI employee Barbara Breibach ("Breibach"). Bauknecht's Complaint has two counts:

1. Count I is a diversity[1] claim for conversion, challenging ERI's refusal to refund a very large overpayment Bauknecht mistakenly sent to ERI in connection with a purchase order for two samples of an ERI-manufactured electronic device.

2. Count II asserts a claim against all defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68.

In turn defendants filed a Counterclaim seeking damages for breach of contract. Both sides have filed various motions, three of which are fully briefed and thus ready for disposition:

1. defendants' motion to strike the May 7 and July 1, 1982 affidavits ("Bormann Affidavits") of Gerrald Bormann ("Bormann"), an employee of Bauknecht's Legal Department;

2. Bauknecht's Fed.R.Civ.P. ("Rule") 56 motion for summary judgment on Count I; and

3. Bauknecht's motion to strike defendants' Counterclaim and jury demand.

For the reasons set forth in this memorandum opinion and order, this Court grants in part defendants' motion to strike the May 7 Bormann Affidavits, denies (albeit regretfully) Bauknecht's motion for summary judgment and grants its motion to strike the Counterclaim and the jury demand.

### Facts[2]

In response to an ERI advertisement, Bauknecht representative Hoffmann ("Hoffmann") sent a letter to ERI (P.Aff. Ex.A, received by ERI May 21, 1981) requesting a sample of ERI's Power Factor Controller (the "Controller") for possible

---

1. Bauknecht is a German corporation, and the two corporate defendants are both Illinois-based, as are the individual defendants.

2. Except as otherwise noted, this factual account reflects uncontroverted documentary evidence. For that purpose, reference is made wherever possible to Exhibits to the Feb. 8, 1983 Pascente Affidavit ("P.Aff."). References to the Bormann Affidavits are cited "B.Aff."

use in the Bauknecht-manufactured lines of freezers and refrigerators. Pascente's May 28 reply letter (P.Aff.Ex.B) said Bauknecht must pay for samples on a COD basis or by letter of credit. Bauknecht's June 26 telex to Pascente (B. May 7 Aff.Ex. 1) ordered two sample Controllers and asked for a price quotation and order acknowledgement by telex. On June 30 and again on July 1, Breibach sent identical confirming telexes (P.Aff.Ex.C; B. May 7 Aff.Ex.A) (emphasis only in the July 1 telex):

> PRICE FOR 2 UNITS OF PB2403–1 IS 34.95 EACH. AIR PARCEL POST CHARGES (WITH INSURANCE) IS 20.-00USD. THEREFORE, *ENTIRE ORDER IS 89.90USD.*
>
> DELIVERY WILL BE 2–4 WKS AFTER RECEIPT OF PAYMENT. WE WILL ACCEPT EITHER CASH IN ADVANCE OR BANK TRANSFER.
>
> FOR BANK TRANSFER PLS ISSUE TO *AMERICAN NTL BANK OF CHICAGO, OUR ACCOUNT NO IS 186384.* PLS ADVISE WHICH METHOD OF PAYMENT U CHOOSE.

On July 3 a clerk in Bauknecht's accounting department caused Bauknecht's bank (inadvertently according to Bauknecht)[3] to wire $89,900 rather than the $89.90 to that ERI account. Bauknecht's banking transaction document (B. May 7 Aff.Ex. 3) contained the following entry:

> 2 Units of P8 2433–
>
> Power Factor Controller
>
> US $89.900,—

On that same day Pascente allegedly received a telephone call from Hoffmann, an assertion hotly contested by Bauknecht. According to P.Aff. ¶ 7:

> On July 3, 1981, I received a telephone call from Mr. Hoffmann of BAUKNECHT. Mr. Hoffmann identified himself by saying that he was calling for BAUKNECHT and that his company had just recently ordered two samples of Power Factor Controllers, and he said that he wanted to purchase another 2,500 units. I told Mr. Hoffmann that with our packaging for shipments there were 134 units to each pallet and that was the best way to ship. Therefore, I said to Mr. Hoffmann that 19 pallets would come the closest to his 2,500 figure, and that the total figure would then be 2,548 units. I told Mr. Hoffmann that the unit price was the same as for the sample, $33.95 [sic], and that we should allow about $3,000.00 for shipping. Mr. Hoffmann said that he wanted the units and was purchasing such units at that price and that he needed the units as soon as possible. I then told him that full payment in advance by letter or credit or cash was required by company policy in conformity with the prior letter and telex, and that no work or shipment would take place without such full payment. Mr. Hoffmann said that that was fine. Mr. Hoffmann then said that he wanted 12 sets of literature for a possible new German distributorship with a potential of 50,000 units annually. We then said goodbye to each other. Since I have a habit of taking notes of my telephone conversations, I made notes during my telephone conversation with Mr. Hoffmann, and a true and correct copy of such notes is attached hereto as Exhibit D.[4]

P.Aff. ¶ 8 says ERI immediately proceeded to fill that 2,548 unit order (by making substantial purchases of needed supplies and initiating the manufacturing process itself) when it received the $89,900 on July 7.

On July 10 Hoffmann sent to Breibach confirmation of Bauknecht's order for *two* Controllers at the originally-quoted price of $34.95 per unit and $20.00 postage. Accord-

---

**3.** Continental (including German) usage is the precise obverse of the United States practice of using periods (or "full stops") and commas in numbers: Where we use commas (as in $9,000,000) they use periods ($9.000.000), and where we use a period to indicate a decimal point (as in $5,689.98) they use a comma ($5.689,98).

**4.** To corroborate his affidavit Pascente has submitted a purportedly contemporaneous memorandum of that telephone conversation. P.Aff.Ex. D.

ing to P.Aff. ¶ 9, on July 24 an invoice (P.Aff.Ex.E) was purportedly sent to Bauknecht, confirming receipt of payment for the 2,546 additional units supposedly ordered by Hoffmann during the alleged July 3 conversation:

| Quantity Ordered | Description | Unit Price | Amount |
|---|---|---|---|
| 2546 | POWER FACTOR CONTROLLER | | |
| | Change order increase order as follows | | |
| | PB2403–1 240VAC 3HP Single Phase | $33.95 | $86,436.70 |
| | Order paid in full - bank transfer of 89,810.10USD to American National Bank of Chicago | | |
| | Estimated Air Freight 4000 pounds | | $3,000.00 |
| | Credit Allowance | | $ 373.40 |

That invoice promised delivery by September 28.

On August 5 Hoffmann sent a telex (B. July 1 Aff. ¶ 5, incorporating Cplt.Ex.CC) to Breibach. Bauknecht's copy of that telex again unequivocally confirmed its order of *two* Controllers:

RE OUR ORDER NBR. 043290 OF JULY 10TH
WE ORDERED TWO POWER FACTOR CONTROLLERS TYPE PB 2403–1 BUT DIDN'T RECEIVE THEM UNTIL NOW. YOU PLEASE MAY CONFIRM OUR ORDER AND DISPATCH THEM AS SOON AS POSSIBLE

As received by ERI the telex (P.Aff.Ex.G) was somewhat scrambled, though it expressly referred to Bauknecht's July 10 telex purchase order (which was for only two units):

RE OUR ORDER NBR. 043290 OF JULY 10TH
WE OR
    DERED TWO T
        HO POWER FACTOR CONTROLLERS TYPE
        PB 2403–1
BUT DIDN'T RECEIVE THEM UNTIL NOW.
        YOU PLEASE MAY CONFIRM OUR ORDER AN
D DISPATCH AS SOON AS
POSSIBLE

Later that same day Breibach sent a return telex (B. July 1 Aff. ¶ 6, incorporating Cplt.Ex. DD), which referred to Bauknecht's July 10 order and stated "SORRY FOR DELAY. UNITS ARE SHIPPING TODAY VIA A.P.P." ERI shipped *two* Controller units, not 2,000 or 2,548 units.

On August 12 ERI mailed an invoice (B. May 7 Aff.Ex. B) confirming shipment of *two* Controllers per Bauknecht's July 10 purchase order at a unit price of $34.95 for a total of $89.90 (including $20.00 in postal charges). Significantly that invoice states, "Paid in full—bank transfer of $89.90 USD to American National Bank of Chicago."

On September 3 Pascente sent the following telex (B. July 1 Aff. ¶ 7, incorporating Cplt.Ex. EE) to Bauknecht—according to Bauknecht, the first clue ERI had been sent $89,900 rather than $89.90:

WE HAVE SHIPPED 2 UNITS AGAINST YR ORDER OUR W/O NO 11020 FOR 2546 UNITS. THE BALANCE OF YR ORDER WILL BE SHIPPED IN 10 WEEKS.

By return telex that same day, Bauknecht informed Pascente and Breibach (B. July 1 Aff. ¶ 8, incorporating Cplt.Ex. FF):

EXCUSE, THERE IS A MISUNDERSTANDING. OUR BOOK-KEEPING DEPARTMENT REMITTED INSTEAD OF USD 89.90—USD 89 900.00.

WE DON'T NEED 2546 PIECES BUT ONLY THE 2 UNITS ORDERED.

PLEASE REMIT THE DIFFERENCE OF USD 89 810.10 BACK TO DRESDNER BANK AG, STUTTGART ACCOUNT NO 9 008 676

Bauknecht has since made numerous unsuccessful demands for repayment.

### Motion To Strike Bormann Affidavits

■ In principal part the two affidavits tendered by Bormann are devoted to laying the foundation for admitting, under the routine business record exception to the hearsay rule (Fed.R.Evid. 803(6), "Rule 803(6)"), the various documents furnished in support of Bauknecht's summary judgment motion. Bormann's May 7 Affidavit contains two other assertions as well:

1. Paragraph 7 states, "In German trade and practice, the full stop designates one thousand; whereas, in the United States, it is a decimal point designating a break between dollars and cents."

2. Paragraph 8 says, "Due to the accountant's lack of familiarity with United States trade practice, a check in the amount of $89,900.00 was issued in payment of the invoice. . . ."

Defendants contend Bormann lacks personal knowledge to testify as to any of the matters in the Affidavits. That argument is groundless except as to Bormann's competency to attest to B. May 7, Aff. ¶ 8:

1. Paragraph 2 in each Bormann Affidavit contains averments of personal knowledge, presumptively sufficient to render Bormann "a custodian or other qualified witness" whose testimony can satisfy the prerequisites of Rule 803(6).

In fact Bormann even authored some of the documents in question, as defendants concede. In any event, in the absence of any indication of those documents' lack of trustworthiness or authenticity, Bormann's failure to elaborate in greater detail as to the basis of his firsthand knowledge does not justify striking that portion of his affidavit.

2. As a German national Bormann certainly has personal knowledge of the significance of the "full stop" in German practice.[5]

By contrast Bormann's statement of the accountant's reasons for wiring $89,900 rather than $89.90 to ERI has to be inadmissible hearsay. B. May 7 Aff. ¶ 8 will therefore be stricken.

### Summary Judgment on Count I

■ Count I charges ERI with conversion of all but $89.90 of the $89,900 forwarded by Bauknecht to ERI. Under Illinois law a cause of action for conversion has four elements:

1. an unauthorized and wrongful assumption of control, dominion or ownership by a person over the personalty of another;

2. plaintiff's right in the property;

3. plaintiff's absolute and unconditional right to immediate possession of the property; and

4. demand for possession by the plaintiff.

*Hoffman v. Allstate Insurance Co.,* 85 Ill. App.3d 631, 634, 40 Ill.Dec. 925, 927, 407 N.E.2d 156, 158 (2d Dist.1980). Of course the fourth element is satisfied here. But the parties bitterly dispute the fundamental premise of the other three propositions— Bauknecht's entitlement to the $89,810.10.

Bauknecht advances two reasons for summary judgment:

1. Its contractual commitment to purchase ERI's controllers was limited to

---

**5.** Indeed, the continental usage described in n. 3 is so widely known this Court could well take judicial notice of it.

two sample units at a total price of $89.90.

2. Its clerk mistakenly transferred $89,900 instead of the $89.90 actually owed because of his misunderstanding of the dollars and cents decimal designation.

ERI counters that the Pascente Affidavit, coupled with the purported July 24 invoice, supports a reasonable inference ERI was contractually entitled to all but perhaps $400 of the $89,810.10 in dispute: [6]

1. P.Aff. ¶ 7 claims Bauknecht, via its agent Hoffmann, orally agreed to purchase an additional 2,546 units (at an additional cost of $89,436.70) on July 3—the same day Bauknecht wired $89,900 to ERI.

2. That oral agreement falls within an exception to the UCC Statute of Frauds, Ill.Rev.Stat. ch. 26, § 2–201(1) ("Section 2–201(1)"), because the July 24 invoice constituted "a writing in confirmation of the contract and sufficient against the sender .... [and no] written notice of objection to its contents [was] given within ten days after it [was] received" by Bauknecht (Section 2–201(2)).[7] Bauknecht's receipt of that invoice can be reasonably inferred (for Rule 56 purposes)

from the statement in P.Aff. ¶ 9 that the document was sent to Bauknecht.

ERI insists such evidence suffices to create a "genuine issue" that defeats Bauknecht's summary judgment motion. Bauknecht retorts the uncontroverted documents tendered in this case compel the conclusion (as a matter of law) such evidence is spurious and thus incapable of giving rise to a "genuine" factual issue—even when reasonable inferences (especially as to Pascente's demeanor at trial) are indulged in defendants' favor. *See DeLuca v. Atlanta Refining Co.,* 176 F.2d 421, 423 (2d Cir.1949) (summary judgment granted because the supporting evidence could not conceivably be refuted by the production of any conflicting evidence), *cert. denied,* 338 U.S. 943, 70 S.Ct. 423, 94 L.Ed. 581 (1950); 10A Wright and Miller, Federal Practice and Procedure § 2727, at 163–65, 170 ("And, although the court should refrain from assessing the probative value of the material presented, evidence in opposition to the motion that clearly is without any force is insufficient to raise a genuine issue" and "[T]he evidence offered must have the force needed to allow a jury to rely on it and the court may disregard an offer of evidence that is too incredible to be believed."). But

---

6. ERI has pleaded that contractual theory as both an affirmative defense and counterclaim.

7. Defendants also suggest the applicability of two other exceptions to the UCC Statute of Frauds, neither of which hinges on the existence of a subsequent confirmatory writing:

1. Section 2–201(3)(a) exempts oral contracts for goods that "are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business ... [provided] the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement...." P.Aff. ¶ 13 certainly suffices to create a genuine disputed issue as to the substantiality of ERI's performance before being notified of repudiation (see n. 10, suggesting the possibility ERI had notice as early as July 10—one week after the alleged oral contract was made). But there is no evidence whatever the Controllers were not "suitable" for sale to others. Indeed the undisputed record confirms Bauknecht never asked ERI to conform the goods to any par-

ticular specifications. It simply ordered Controllers ERI had offered in its advertisements to the public at large.

2. Section 2–201(3)(c) insulates from the Statute of Frauds oral contracts concerning "goods for which payment has been made and accepted or which have been received and accepted." This exception of course turns on one of the issues as to which Bauknecht contends there is no genuine dispute: whether the $89,900 payment served as consideration for the additional 2,546 units allegedly ordered. For summary judgment purposes that issue is inextricably intertwined with the issue as to the oral contract's very existence. To the extent the latter issue is found to be a genuine dispute, the former must be similarly regarded. Assuming an oral contract was actually formed July 3, Bauknecht's transfer of $89,900 that same day creates a reasonable inference that payment was intended as consideration, notwithstanding the documentary and affidavit evidence attributing the payment to clerical error.

that notion is really not suited to what this case would require—treating a detailed (not merely vague or conclusory) affidavit as "too incredible to be believed" (that is, as perjurious).

True enough, Bauknecht is certainly correct in pointing out the evidentiary poverty of defendants' position. Were the present record being weighed in the scales rather than being examined for the presence of any factual issue, the result could not be in doubt—all the circumstantial evidence compels the conclusion the alleged oral contract is non-existent, at the same time substantiating Bauknecht's explanation for its transmission of the $89,900: [8]

1. B. May 7 Aff.Ex. 3, the banking transaction document authorizing the $89,900 payment, convincingly supports Bauknecht's claim the employee who filled out that form mistakenly converted the intended $89.90 into a wholly unintended $89,900:

(a) That document expressly shows the authorized payment was for *two* Controller units.

(b) Its accompanying entry, "US $89.000,-" also suggests the cause of the clerical error: Bauknecht's employee likely added a "0" to the $89.90 in the belief the period was a "thousands" indicator in conformity with German practice. That is all of a piece with the clerk's inverted use of the period and comma, which indicates his mistaken belief that such punctuation served the same function in denoting sums of money in both United States and German currency.

2. ERI's purported July 24 invoice shows the $89,900 payment exceeded (by $373.40) the amount due for both the two sample units and the additional 2,546 units supposedly ordered. That itself strongly implies the payment was not made as consideration for the alleged oral contract. Were Pascente's account of the supposed telephone call factual, the logical expectation would have been Bauknecht's payment of the correct amount, not a rounded figure (which "just happened" to be exactly 1,000 times the agreed-upon price—including postage— for the agreed-upon *two* units).

3. All the post-July 3 communications and course of dealings between the parties are also instructive:

(a) Just one week after the alleged oral contract was made, Hoffmann (the one who allegedly entered into that contract) sent a telex that confirmed only the original order for the *two* sample Controllers. That telex's conspicuous silence as to the claimed 2,546 unit purchase order belies its very existence, for any purchasing agent with a modicum of business prudence would have taken that occasion to make at least some mention of it.

(b) Again on August 5 Hoffmann sent another telex indicating Bauknecht had not received the *two* Controllers previously ordered. That telex too illuminates Bauknecht's ignorance of any oral contract with ERI. Concededly the telex received by ERI was garbled, containing the word and non-word

"TWO T ."<br>HO

But the odd addition of

T<br>"HO"

in the transmission process obviously does not affect any inference drawn from the telex message Hoffmann attempted to convey. Nor does it lend any credence to the alleged oral contract:

(1) Pascente's asserted oral contract was for 2,546 additional units, not 2,000 units.

**8.** Bauknecht's attribution of its $89,900 payment to a clerical misunderstanding is fundamentally inconsistent with defendants' contract theory, which asserts Bauknecht deliberately paid that sum as consideration for the oral purchase order (P.Aff. ¶ 14). Defendants would be hard pressed to argue Bauknecht entered into the oral contract after its discovery of the excessive payment so that defendants could repay Bauknecht in the form of goods rather than currency. It is clear beyond dispute (1) Bauknecht's clerk authorized the bank to wire the funds the same day the alleged oral contract was executed and (2) the bank did not actually transmit the funds until several days later. See P.Aff. ¶ 9 (July 7); B. May 7 Aff.Ex. 3 (July 10).

(2) Bauknecht's August 5 telex expressly referred to the July 10 telexed purchase order, which was for the two sample units.

(3) Most importantly, Breibach's own August 5 reply telex, which said the ordered goods were being shipped immediately, coupled with the fact that only two units were actually shipped, demonstrates *defendants* realized

$$\frac{\text{"TWO T  "}}{\text{HO}}$$

meant simply "two." [9]

(c) In light of Bauknecht's practice of carefully documenting its $89.90 order, its failure to issue even a single document verifying the $89,810.10 order reinforces the doubt any such order was ever placed.

4. No business is likely to purchase large quantities of a component part to be incorporated in the final product (freezers and refrigerators in this case) for the first time without having seen or used any samples. That abnormal conduct is rendered even more abnormal by the sequence of an admitted original order for a very small sample to check its suitability, allegedly followed by an extremely large order before the samples were even delivered.

5. ERI's alleged July 24 invoice is also highly suspect:

(a) There are several indications of its lack of authenticity—of its having been fabricated after August 12:

(1) Every externally verifiable ERI document through August 12 (the June 30 and July 1 telexes, the August 5 telex and the two-unit shipment, and the August 12 invoice reflecting that shipment and only the $89.90 "paid in full" amount) uniformly spoke simply of the two units and the $34.95 unit price. Only after August 12 did any verifiable document reflect another number (the September 3 telex spoke of "2546 units"). In that context the

"July 24 invoice" sounds a wholly false note.

(2) ERI's "July 24 invoice" referred to "ERI Work Order No. 11020–*02*," while the unquestioned August 12 invoice covered "No. 11020–*01*." Had a July 24 invoice actually existed on August 12, and had that July 24 invoice really referred to a second work order, surely the later August 12 invoice would not have read as though it were the only then-outstanding order (note the invoice form has spaces for "Quantity order," "Quantity shipped" and "Quantity back ordered").

(3) ERI's September 3 telex simply referred to its "w/o ["work order"] no. *11020* for 2546 units." How so, when the supposedly pre-existing "July 24 invoice" (actually a *work order* form) showed the 2546 units as having been ordered under "ERI Work Order No. *11020–02*"? And it will not wash to say "11020" was intended to encompass *both* alleged orders, for then the telex would have referred to "hav[ing] shipped 2 units against yr order our w/o no. 11020 for [*2548* not *2546*] units."

(4) Though the August 5 invoice for the two units actually shipped was indeed an "invoice" form (prenumbered and thus chronologically verifiable), the "July 24 invoice" was actually a "work order" form with *no* preprinted number (hence easily predated, with no means of verification).

(5) Had Pascente really had the July 3 conversation with Hoffmann (just two days after the two-unit commitment was made at *$34.95* per unit), there would be no rational explanation for his setting what he acknowledged as the "same" unit price at *$33.95* for the asserted 2546 unit order. It should be remembered that only Pascente's allegedly contemporaneous notes

**9.** Arguably the August 5 and July 10 telexes (and perhaps the July 10 telex alone) alerted defendants as to Bauknecht's ignorance (or renunciation) of the oral contract. Under those circumstances, even were the oral contract enforceable Bauknecht would not be accountable for the production costs (or other damages) incurred by defendants after they were put on notice.

(P.Aff.Ex. D), the "July 24 invoice" and the 1983 Pascente Affidavit mention the peculiar $33.95 figure—all of them internal (that is, unconfirmed) documents.[10]

(6) P.Aff.Ex. D reflects an astonishing level of prescience. Bearing a July 3 date and assertedly prepared contemporaneously with the alleged phone call that day, it refers to "Order Paid in Full—bank transfer of $87,810 USD..." (the same language that appeared on the "July 24 invoice"—obviously $89,900 less the $89.90 applicable to the two units). Yet not a word in the alleged Pascente-Hoffmann telephone conversation referred to a funds transfer of an even $89,900 rather than the right amount as assertedly quoted by Pascente.

(b) Even were the existence of the "July 24 invoice" plausible, there would remain the question whether it was ever sent to or received by Bauknecht—one of the prerequisites of the Section 2–201(2) exception to the UCC Statute of Fraud requirements:

(1) ERI's alleged transmission of the July 24 invoice is inconsistent with defendants' treatment of the original two-unit order, as to which defendants' first acknowledgment occurred *after shipment.*

(2) Bauknecht's failure to mention the July 24 invoice in any subsequent communication (including the August 5 telex) is strongly probative of its non-receipt of that document. Its immediate response to the first uncontroverted communication hinting at the existence of the oral contract (the September 3 telex) underscores the significance of that factor.

This discussion has not sought to be exhaustive. That task will be left to those with better facilities for investigation.[11] Certainly a substantial argument can be made for the proposition that ERI's "evidence ... is too incredible to be believed." Nonetheless, taking (as a Rule 56 motion requires) all inferences in defendants' favor—thin though their position appears—this Court cannot foreclose further factual inquiry by granting Bauknecht a judgment at this stage:[12]

---

10. Only Pascente really knows the explanation of the many disparities in ERI's story. But a little calculation may give some hint as to the origin of the odd $33.95 number. ERI packages its Controller units 134 to the pallet (that was the alleged origin of the 2548-unit quantity, comprising 19 pallets and coming closest to the claimed 2500-unit telephone order by Hoffmann). If $89,900 (the amount Bauknecht sent ERI) is divided by the originally-quoted $34.95 price, the quotient works out to 2572 units. That comes very close to the 2548 figure; and it could rationally explain why, with $89,900 in hand and wanting to develop a cover story to keep that windfall, ERI might transmit (as it did) a September 3 telex referring to 2546 units. But with the telex having gone out, a problem would seem to present itself when ERI later found it necessary to flesh out its story: There is just no room for the normal shipping charges within the matrix of the two now-non-changeable figures ($89,900 and 2546) and the original $34.95 unit price. How then develop a plausible explanation that takes shipping costs into account? Voila—lop off $1 per unit to $33.95! Only a "minor" discrepancy remains—$33.95 is really not the "same" price as $34.95. Like so much of defendants' presentation, this whole thing seems to have the ring of "Oh, what a tangled web we weave, when first we

practise to deceive." Scott, *Marmion,* canto VI, stanza 17.

11. Defendants' final memorandum on the current motion concludes:

> The Reply Memorandum of Plaintiff is replete with misstatements and wrongful accusations. However, the Defendants will not burden this Honorable Court with a discussion of all of these misstatements and wrongful accusations. The documents, affidavits, and memorandums speak for themselves and this Honorable Court can draw its own conclusions.

This opinion has accepted that invitation, and though this Court expresses no ultimate views on the subject, it scarcely needs to spell out the potential implications of the matters discussed in the text. They certainly call out for further inquiry. Accordingly this opinion is being sent to the United States Attorney's office with the request that the factual and legal issues be examined for any possible violations of the criminal laws.

12. No Seventh Circuit authority has been found applying the "too incredible" approach to reject admissible evidence creating an issue of material fact. Instead the uniform teaching of

1. Bauknecht's banking transaction document does not alone conclusively establish clerical oversight as the reason for Bauknecht's $89,900 payment to ERI. After all, the document did authorize the payment of "US $89.900,–." And Bauknecht's clerk's use of the period and comma is arguably consistent with defendants' contention that transfer of the $89,900 was intended and not accidental.

2. Bauknecht's (and for that matter ERI's) failure to acknowledge the alleged oral contract in the pre-September 3 communications (excluding the purported July 24 invoice) is not fatal to defendants' position as a matter of law. It could perhaps be argued both sides ignored the claimed 2,546 unit purchase order during that period because delivery was supposedly scheduled for September 28.

3. Serious questions as to the authenticity of the July 24 invoice or its transmission to Bauknecht [13] still require the resolution of disputed facts.

4. Apart from the difficulties of reconciling it entirely with the purported July 24 invoice, the August 12 invoice is consistent with both sides' positions: It merely confirms the shipment of the two Controllers and acknowledges receipt of the $89.90 bank transfer.

5. Bauknecht's failure to tender any affidavit or deposition testimony from (a) Hoffmann, (b) the clerk responsible for paying the $89,900 or (c) any other Bauknecht official with personal knowledge as

to the non-existence of the oral contract or the reason for the $89,900 payment leaves the field to the Pascente Affidavit, dubious though it may be.[14]

In sum, this Court must reluctantly deny Bauknecht's summary judgment motion because of the existence of genuinely disputed issues of material fact. If however it ultimately develops that the strong suspicions evoked by the matters discussed in this opinion are justified in fact, defendants should recognize the possibility of being assessed for fees as well as damages.[15]

### Motion To Strike Jury Demand and Counterclaim

Resolution of both aspects of this motion requires a brief excursion into the case's procedural background. On July 2, 1982 the Complaint was served on defendants. On August 18, 1982 defendants filed their Answer, which included affirmative defenses based on the alleged oral contract. Two months later defendants filed an Amended Answer. On February 8, 1983 defendants filed a Second Amended Answer and Counterclaim. That responsive pleading was the first one to include a jury demand. Defendants' alleged Counterclaim is also based on the alleged oral contract and involves the same issues already raised by defendants' affirmative defenses.

### 1. *Counterclaim*

█ Rule 13(f) prescribes the standards under which originally omitted counterclaims can be pleaded by amendment:

our Court of Appeals is that matters of credibility must not be resolved on a summary judgment motion. See discussion in *Thornton v. Evans,* 692 F.2d 1064, 1074–75 (7th Cir.1982).

**13.** Bauknecht's receipt of the July 24 invoice is really irrelevant for current Rule 56 purposes in any event. As already explained in n. 7, a finding that the oral contract's existence is genuinely controverted necessarily implies a genuine dispute as to whether the $89,900 was intended as payment for the additional 2,546 units. And a finding it was *so intended would* enable the alleged oral contract to withstand Statute of Frauds assault on this summary judgment motion.

**14.** Even were the assertion in B. May 7 Aff. ¶ 8 attributing the $89,900 to clerical error founded on personal knowledge, its admissibility would

not alter the outcome. Because the clerical oversight explanation is incompatible with the existence of an oral contract, the evidence creating a factual issue on the latter subject necessarily raises a genuine issue on the former as well.

**15.** Bauknecht also raises Rule 11 in the course of its arguments. Defendants' counsel, members of a reputable law firm, of course must recognize their responsibility to do more than accept at face value the kind of presentation offered up by Pascente. At this point this Court must assume defendants' counsel have discharged their responsibilities in that respect and can make the certificate implicit in Rule 11 in good faith.

When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment.

As 6 Wright & Miller § 1430, at 153 makes clear, courts are exceedingly liberal in allowing a party to plead a counterclaim omitted from an earlier pleading, particularly where as here the counterclaim is said to be compulsory under Rule 13(a).

One way to look at defendants' delinquency here is in terms of their failure to satisfy their Rule 13(f) burden. Nothing in ERI's memorandum suggests their omission resulted from "oversight, inadvertence, or excusable neglect. . . ." Nor does ERI contend the "justice requires" standard warrants retention of the Counterclaim.

But there is an even more basic flaw in defendants' position: They have really not asserted a counterclaim at all. *They* have the $89,900. If they are *correct* in their position, they already have all the relief to which the law would entitle them:

    1. Under UCC § 2–708 (which governs a seller's damages for non-acceptance or repudiation by the buyer), ERI would be entitled to the greater of (a) the difference between the market price at the time and place of tender and the unpaid contract price and (b) the profit ERI would have realized from full performance by Bauknecht, plus (c) any "incidental damages" under UCC § 2–710.

    2. ERI has already received the "greater" component of damages, for on its own theory it has concededly received the full contract price (and hence full performance) from Bauknecht.

    3. There is no claim of any "incidental damages" arising from Bauknecht's breach. That is scarcely surprising, for Bauknecht never breached the oral contract. Even under defendants' version of events, Bauknecht merely repudiated the asserted oral contract after fully performing its supposed obligation—payment of the contract price.

    4. Nor can the attorneys' fee element of the Counterclaim's prayer for relief be characterized as "incidental damages." That UCC concept is limited to expenses incurred by the seller in retrieving and reselling the goods refused by the repudiating buyer. Moreover, defendants' prayer for attorneys' fees (even if supported by law, a showing not yet made) merely echoes a like claim already in the Answer.

It would be a distortion to label as a "counterclaim" a pleading that adds nothing to the issues already in suit and that would provide the claimant nothing it does not already have.[16] To the skeptic it might appear defendants tendered their pleading as a means of asserting an untimely jury demand not previously made. That poses the next issue for this opinion.

## 2. Jury Demand

    ■ Under Rule 38(b) any party desiring a jury trial on an issue must make a written request "at any time after the commencement of the action and not later than ten days after the service of the last pleading directed to such issue." As both sides recognize, defendants have no *right* to a jury trial unless their Second Amended Answer and Counterclaim represents the "last pleading directed to such issue." To trigger a new ten-day period, that amended pleading must raise for the first time the issue as to which a jury trial is sought. See 5 Moore's Federal Practice § 38.41, at 38–364 to 38–365.

It plainly does not do that. As already pointed out, the Second Amended Answer and its non-Counterclaim rehash the same contract issues embraced by the earlier filed affirmative defenses. That kind of attempted bootstrapping is hardly enough to satisfy the "last pleading" requirement. *Accord, Leighton v. New York, Susquehanna & W. Ry.,* 36 F.R.D. 248 (D.C.N.Y.1964).

---

**16.** This implies no ruling as to the result if defendants were to offer allegations that "arise out of the transaction or occurrence that is the subject matter of [Bauknecht's] claim" (Rule 13(a)) and seeks relief not already encompassed within their answer.

But that is not the end of the matter, for Rule 39(b) permits "the court in its discretion upon motion [to] order a trial with a jury of any or all issues" despite the lack of a timely demand. To qualify for discretionary relief, the delinquent party must furnish an adequate justification for his tardiness. Though case law is split as to what constitutes a sufficient excuse, even the most lenient approach (to which our own Court of Appeals subscribes, see *Merritt v. Faulkner,* 697 F.2d 761, 766, 767 (7th Cir. 1983)) requires a showing of inadvertence. See also *Williams v. Lane,* 96 F.R.D. 383 at 387 (N.D.Ill.1982).

Defendants have not even proffered that as the reason for their untimely demand. Instead they argue their constitutional right to a jury cannot be forfeited unless prejudice to Bauknecht is established. That argument misapprehends the applicable standards. Any inquiry as to prejudice will be triggered (if at all) only after a party furnishes an adequate excuse for his or its delinquency. See *Pawlak v. Metropolitan Life Insurance Co.,* 87 F.R.D. 717, 719 (D.C. Mass.1980).

Accordingly defendants' jury demand must be stricken. This ruling however is without prejudice to a renewed jury demand if accompanied with proof (in affidavit form) of an adequate excuse.

### Conclusion

Paragraph 8 of the May 7 Bormann Affidavit is stricken. Bauknecht's motion for summary judgment is denied. Its motion to strike the Counterclaim is granted. Its motion to strike defendants' jury demand is granted, without prejudice to reassertion of that demand on an appropriate showing.